******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* LUIZ ROMAN
## (SC 20993)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Pursuant to statute (§ 54-84 (b)), "[u]nless the accused requests otherwise, [a trial] court shall instruct the [jurors] that they may draw no unfavorable inferences from the accused's failure to testify."

Convicted of murder in connection with the shooting death of the victim, the defendant appealed to this court. During jury selection, the trial court had given a no adverse inference instruction to each of the venire panels that were assembled for the defendant's trial. The court also gave a no adverse inference instruction to the jury once the jury was sworn in, before the start of evidence, as part of the court's preliminary instructions. At trial, the state introduced the testimony of various detectives, among others, as well as surveillance footage depicting the defendant and the victim on the day of the murder. Because there was a lack of physical evidence connecting the defendant to the murder, however, the state relied primarily on prior statements that the defendant had given to the police, among others, to highlight inconsistencies between those statements and the other evidence introduced at trial. The defendant did not testify, and the trial court did not include the no adverse inference instruction required by § 54-84 (b) in its final jury instructions given after the close of evidence but before the jury began its deliberations. On appeal to this court, the defendant claimed that the trial court had committed plain error by omitting the no adverse inference instruction required by § 54-84 (b) from its final jury instructions. *Held*:

The trial court committed plain error by omitting the no adverse inference instruction required by § 54-84 (b) from its final jury instructions, and, accordingly, this court reversed the judgment of conviction and remanded the case for a new trial.

The omission of the no adverse inference instruction from the final jury instructions was an obvious and readily discernable error, as the trial court overlooked controlling Appellate Court precedent requiring that such an instruction be included in the trial court's final jury instructions.

In *State* v. *Hicks* (97 Conn. App. 266), the Appellate Court clearly and unequivocally held that the no adverse inference instruction required by § 54-84 (b) must be included in a court's final jury instructions and that a no adverse inference instruction in a court's preliminary instructions is an inadequate substitute, and that holding has not been overruled or undermined since *Hicks* was decided in 2006.

Although this court has not previously considered whether the holding in *Hicks* is correct, this court did so as a part of its plain error analysis and concluded that the Appellate Court had properly construed § 54-84 (b) to require a trial court to give a no adverse inference instruction as part of

its final jury instructions, immediately prior to the commencement of the jury's deliberations.

Although § 54-84 (b) does not explicitly state when the no adverse inference instruction must be given, a historical review of that statute and its predecessors, and the fact that the statute was intended to effectuate a defendant's fundamental constitutional right not to testify, supported the conclusion that the legislature intended that the required no adverse inference instruction be included in a court's final charge to the jury, unless the defendant requests otherwise.

This court nevertheless rejected the defendant's argument, premised on the Appellate Court's decision in *State* v. *Suplicki* (33 Conn. App. 126), that the complete omission of the no adverse inference instruction from the jury instructions required automatic reversal of his conviction.

The trial court's failure to give the no adverse inference instruction did not constitute the type of structural error that was exempt from harmless error analysis, as it was not the type of error that affected the framework within which the trial proceeded or that pervaded the entire proceeding, and a rule requiring the automatic reversal of a conviction was unnecessary to protect the interest safeguarded by § 54-84 (b), namely, a defendant's constitutional right not to testify.

Moreover, this court has previously held that the failure to give a no adverse inference instruction when requested by the defendant, in violation of United States Supreme Court precedent, did not constitute structural error and was subject to harmless error analysis, and all federal courts, and the vast majority of state courts, have agreed that such an error is not structural error but, rather, is subject to harmless error review.

Accordingly, this court overruled *Suplicki* to the extent that it required the automatic reversal of a conviction when a trial court's jury instructions fail to comply with § 54-84 (b).

This court clarified that the second stage of the plain error analysis for claims involving noncompliance with § 54-84 (b) should be conducted under the constitutional harmless error rubric, pursuant to which the state must establish, beyond a reasonable doubt, that there is no reasonable possibility that the jury was misled as a result of the instructional error.

In the present case, the state failed to demonstrate that the trial court's omission of the no adverse inference instruction was harmless beyond a reasonable doubt.

It was of no consequence that, in its final instructions, the trial court instructed the jury with respect to the defendant's presumption of innocence, the state's burden of proof, and the generic prohibition against guesswork, as those directives failed to address the harm that might flow from the jurors' speculation about the meaning of the defendant's silence and the risk that the jurors might improperly give evidentiary weight to the defendant's decision not to testify.

It also was of no consequence that the trial court gave a no adverse inference instruction to the venire panels during jury selection and to the jury in its preliminary instructions, as final jury instructions serve a crucial purpose distinct from that of preliminary instructions, there was a risk that a jury might not remember and follow the instruction if it were given during jury selection or in the court's preliminary instructions but omitted from the court's final instructions, and the inclusion of the instruction in the preliminary instructions and exclusion thereof in the final instructions were just as likely to result in overall confusion as coherency.

With respect to the strength and nature of the state's evidence of guilt, the state's theory of guilt relied heavily on the defendant's prior statements, such as his descriptions of his movements on the day the victim disappeared, which were inconsistent with other evidence adduced at trial, and the nature of that evidence and the state's theory would have invited the jury to speculate why the defendant had chosen not to take the stand to explain his prior statements and could reasonably have led the jury to draw an adverse inference from his failure to testify.

(*One justice concurring separately*; *one justice dissenting*)

Argued December 1, 2025—officially released July 14, 2026

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *E. Richards, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed*; *new trial*.

*Kevin M. Black, Jr.*, assigned counsel, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, was *Joseph Corradino*, state's attorney, for the appellee (state).

*Opinion*

ECKER, J. Under General Statutes § 54-84 (b), "[u]nless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify." The trial court in this case gave such an instruction to each of the venire panels during jury selection and to the empaneled

jury in its preliminary instructions before the start of evidence, but omitted it from the final instructions given to the jury after the close of evidence and prior to deliberations. The dispositive issue in this appeal is whether the omission from the final jury instructions was plain error. We hold that it was, and we reverse the judgment convicting the defendant, Luiz Roman, of murder in violation of General Statutes § 53-54a (a).

I
FACTS AND PROCEDURAL HISTORY

The record reflects the following facts relevant to this appeal. The defendant and the victim, Miguel Afzal, were acquaintances who both lived in Bridgeport. On November 20, 2019, the victim played video games at the defendant's home and stayed there overnight. The next morning, the victim spoke with his father by telephone. He told his father that he was walking home and that the defendant would accompany him part of the way. The victim never returned home, however, and his family reported him missing later that day.

The police found the victim's body on December 8, 2019, in the former Remington Arms factory (factory) in Bridgeport. He had been shot in the head. The police did not find the gun used to kill the victim or recover any trace evidence, such as hairs, fibers, bodily fluids, fingerprints, or footprints, from the crime scene.

The police interviewed the defendant three times in November and December 2019. During the interviews, the defendant described his movements on the day the victim went missing. The police showed the defendant images obtained from multiple surveillance cameras, which showed the defendant and the victim walking in the area of the factory on the day of the victim's disappearance, and pointed out inconsistencies between the video evidence and the defendant's statements. The defendant said that he had walked with the victim toward the victim's home; the video evidence, however, depicted the two men walking in the opposite direction. The defendant

also told the police that he and the victim had parted ways at a particular intersection, but the video evidence showed them walking together past that intersection. Although the defendant denied entering the factory, the video evidence depicted him walking with the victim toward the factory and later walking away from the factory without the victim. The defendant told the police that, after separating from the victim, he spent the rest of the day cleaning an apartment in Bridgeport with an acquaintance.

The police also asked the defendant about his clothing and appearance on the day the victim went missing. The surveillance footage depicted the defendant carrying his jacket at some point after leaving the victim, but the defendant could be seen later walking without the jacket. When questioned, the defendant was unable to tell the police what he had done with his jacket in the interim. The defendant's disposal of his jacket that morning became part of the state's theory of guilt at trial.

In addition, the defendant made statements to his own family and to the victim's family about the victim's disappearance. The defendant told his mother that the victim "took something that didn't belong to him, and he owed it to the streets. It happened because it had to happen. . . . [H]e did things in the street, and they made him pay." Four days after the victim went missing, the defendant visited the victim's father and asked him for $900, telling him that it was payment for drugs with which the victim had allegedly run away. When questioned about this during his police interviews, however, the defendant denied asking the victim's father for money.

In December 2019, the defendant moved to Ohio to live with his then cousin-in-law, Jose Cruz Correa (Cruz). In January 2020, the defendant told Cruz that he had been with the victim and a third person when a "problem" arose. The defendant told Cruz that they had taken the victim to a factory, made him kneel, and then shot him in the head. The police had not publicized that the cause

of the victim's death was a gunshot wound to the head. Cruz told the police about the defendant's confession in January 2021, and the police arrested the defendant and charged him with the victim's murder.

The defendant's trial took place from November 8 to 17, 2023. The state's case against him relied heavily on his previous statements. Cruz testified about the defendant's confession, the victim's father testified about the defendant's demand for payment, and a detective testified that, about one week after the victim went missing, the detective visited the apartment that the defendant and his acquaintance were purportedly cleaning on the day the victim disappeared, and the apartment was covered with animal feces and urine. Another detective testified about the defendant's statement to his mother that the victim "owed it to the streets."[1] The state also played video recordings of all three of the defendant's police interviews for the jury. One of the interviewing detectives testified about the video evidence of the defendant's movements on the day of the victim's disappearance, and the prosecutor in closing pointed out the inconsistencies between that evidence and the defendant's interview statements. The detective also testified about the video evidence showing the defendant with and without his jacket on the day the victim went missing and the defendant's inability to explain what he had done with his jacket. During closing arguments, the prosecutor argued that the defendant had disposed of his jacket to change his appearance and that this constituted evidence of the defendant's consciousness of guilt.

The defendant did not testify at trial. The evidentiary portion of the trial ended on November 15, 2023. Counsel presented their respective closing arguments, and the court read its final instructions to the jury the next day, November 16, 2023. A hard copy of the final instructions was provided to the jury for reference, as needed. Jury deliberations began that day and continued into

---

[1] The defendant's mother testified at trial that the defendant had never made such a statement to her.

the following day, when the jury returned its verdict, finding the defendant guilty of murder.

The specific facts regarding the no adverse inference instruction are as follows. Because the defendant did not testify and his lawyer did not request otherwise, the trial court was required to instruct the jurors, pursuant to § 54-84 (b), "that they may draw no unfavorable inferences from the [defendant's] failure to testify." That instruction was not included in the court's final instructions. However, during jury selection in September and October 2023, the trial court advised each venire panel that, "[i]f . . . the defendant decides not to testify, you must draw no unfavorable inference from his decision not to testify." The instruction, in sum and substance, was also given to the jury before the start of evidence on November 8, 2023, when the trial court provided the jury with preliminary instructions covering topics such as the order of events during trial, the jury's role as fact finder, and the jury's obligation not to conduct outside research related to the case. As part of these preliminary instructions, the judge informed the jury that, "[t]he defendant . . . has a constitutional right not to testify. You must draw no unfavorable inference from his decision not to testify if he so chooses not to testify."

As noted, the instruction required by § 54-84 (b) was omitted from the final jury instructions given to the jury eight days later, after the close of evidence and closing arguments, and immediately prior to the jury's deliberations. The court had circulated written drafts of the final jury instructions to counsel before and during trial. The drafts did not contain the required instruction, but neither defense counsel nor the prosecutor pointed out the omission or requested that the instruction be included.[2] Defense counsel also took no exception to the final jury instructions after they were read to the jury.

The jury found the defendant guilty of murder, and the trial court rendered judgment accordingly. This direct

[2]The trial court held a preliminary charge conference on October 24, 2023, at which it invited counsel to put on the record any requests for

appeal followed. See General Statutes § 51-199 (b) (3). Additional relevant facts will be provided as necessary.[3]

## II
## DISCUSSION

The defendant claims that the trial court committed plain error by omitting the no adverse inference instruction required by § 54-84 (b) from the final jury instructions after the close of evidence.[4] Our plain error analysis proceeds in two steps. First, the error must be "patent [or] readily [discernible]"; (internal quotation marks omitted) *State* v. *Jamison*, 320 Conn. 589, 596, 134 A.3d 560 (2016); and, second, "the failure to grant relief [must] result in manifest injustice." (Internal quotation marks omitted.) Id., 597; see, e.g., *State* v. *Diaz*, 348 Conn. 750, 762–63, 311 A.3d 714 (2024); see also Practice Book § 60-5.

With respect to the first prong of the plain error test,[5] we have explained that the error must be "pat-

modifications to the final jury instructions. The court also circulated a revised draft of the final instructions to counsel on November 2, 2023. The court and counsel went "over the [final instructions] throughout the evidentiary portion of the trial" and engaged in a final charge conference prior to closing arguments. The no adverse inference instruction was not mentioned in these discussions.

[3] The defendant raises three other claims of error in addition to the § 54-84 (b) issue that we find dispositive. He contends that (1) the trial court improperly instructed the jury on accessorial liability, (2) his conviction resulted from a general jury verdict but one theory of liability was unsupported by the evidence, and (3) the prosecutor made improper arguments in closing argument. We do not address these claims because we do not consider it likely that they will arise on retrial.

[4] The defendant did not raise this issue at trial and does not seek appellate review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). See *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011) (claim of instructional error is implicitly waived "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given"). But see, e.g., *State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017) ("a *Kitchens* waiver does not preclude plain error review").

[5] The term "plain error" is used in our case law in two slightly different ways. Sometimes, it is used generically to refer to the standard of

ent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable." (Internal quotation marks omitted.) *State* v. *Jamison*, supra, 320 Conn. 596. The paradigmatic instance of patent error occurs when "the trial court and the parties have overlooked clearly controlling law, be it a constitution, statute, rule, case law, or established practice." (Internal quotation marks omitted.) E. Prescott & J. Lavoie, Connecticut Appellate Practice & Procedure (8th Ed. 2023) § 8-2:4, p. 504; see, e.g., *Ralto Developers, Inc.* v. *Environmental Impact Commission*, 220 Conn. 54, 59–60, 594 A.2d 981 (1991) ("[w]e have noticed plain error in the failure of a trial court to apply a clearly relevant statute to the case before it" because "our failure to rectify such an evident oversight may undermine public confidence in the judicial proceedings" (internal quotation marks omitted)). Controlling law is the law in existence at the time of trial. See, e.g., *State* v. *Turner*, 334 Conn. 660, 683, 224 A.3d 129 (2020) ("[t]his court has explained that whether an error is clear is premised on the law existing at the time of trial"); see also *State* v. *Bellamy*, 323 Conn. 400, 458 n.6, 147 A.3d 655 (2016) (*Rogers, C. J.*, concurring) ("the trial court's proper application of the law existing at the time of trial cannot constitute reversible error under the plain error doctrine" (internal quotation marks omitted)); *State* v. *Darryl W.*, 303 Conn. 353, 374, 33 A.3d 239 (2012) (same).

Once a court determines that the error is patent, the manifest injustice prong of the analysis asks whether

appellate review applied to unpreserved claims under Practice Book § 60-5, while, other times, it is used to refer only to the first prong of that analysis (i.e., whether an error is plain, patent, or readily discernible). Compare, e.g., *State* v. *Ruocco*, 322 Conn. 796, 803, 144 A.3d 354 (2016) (using " 'plain error' " to refer to doctrine as whole), with *State* v. *Yurch*, 229 Conn. 516, 521, 641 A.2d 1387 (using "plain error" to refer to only patent error prong), cert. denied, 513 U.S. 965, 115 S. Ct. 430, 130 L. Ed. 2d 343 (1994). To avoid confusion, unless the context indicates otherwise, we will refer to the first prong of plain error review as "patent error."

"the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Jamison*, supra, 320 Conn. 596. "[A]n important factor in determining whether to invoke the plain error doctrine is whether the claimed error result[ed] in an unreliable verdict or a miscarriage of justice." (Internal quotation marks omitted.) *State* v. *Pierce*, 269 Conn. 442, 450, 849 A.2d 375 (2004).

This is not the first time that this court has been asked to conduct plain error review of an unpreserved claim regarding a trial court's failure to give the no adverse inference instruction required by § 54-84 (b). See, e.g., *State* v. *Ruocco*, 322 Conn. 796, 803–804, 144 A.3d 354 (2016) (citing cases). As we explained in *Ruocco*, "[t]his court has had a number of opportunities to review the failure of a trial court to incorporate the requirements of § 54-84 (b) into its instructions to the jury. In none of these cases had the [defense] taken an exception at trial. In each of them we chose to review the claim on its merits. . . . [W]e [have] explained that noncompliance with § 54-84 (b) is [patent] error because the statute serves to effectuate the fundamental constitutional right of a defendant not to testify in his criminal trial." (Citations omitted; internal quotation marks omitted.) Id., 803–804; see also *State* v. *Burke*, 182 Conn. 330, 331–32, 438 A.2d 93 (1980) (when "the legislature has chosen specific means to effectuate a fundamental right [as in § 54-84 (b)], failure to follow the mandatory provisions of the statute is plain error, reviewable by this court").

## A
## Patent Error

The obvious and readily discernible error in the present case is evident from controlling Appellate Court case law, existing at the time of trial, construing § 54-84 (b) to require the trial court to give the no adverse inference instruction in its final jury instructions. This was the

Appellate Court's unequivocal holding in *State* v. *Hicks*, 97 Conn. App. 266, 277, 903 A.2d 685, cert. denied, 280 Conn. 930, 909 A.2d 958 (2006). Although the state does not cite *Hicks* in its brief, much less explicitly ask us to overrule that decision,[6] accepting the state's argument would necessarily require us to conclude that *Hicks* was wrongly decided because *Hicks* held that the statutory mandate in § 54-84 (b) is not satisfied under circumstances nearly identical to the present case. See id.

As in this case, the trial court in *Hicks* gave a preliminary no adverse inference instruction to the jury before the start of evidence. See id., 274. In the final jury instructions, the court mentioned that the defendant had not testified and instructed the jury that it should not draw any unfavorable inferences; see id., 268; but the court failed to specify that the jury should not draw unfavorable inferences from the defendant's choice not to testify, as required by § 54-84 (b). See id., 273. The Appellate Court explained the instructional defect as follows: "Although it immediately follows mention of the fact that the defendant did not testify, the court's instruction that the jury 'not draw any unfavorable inference' appears to be an instruction of general applicability, one that is perhaps related to the several instructions that immediately preceded it. . . . The statute requires the court to convey a specific instruction to the jury that no unfavorable inference is to be drawn from the fact that the defendant did not testify. The court's instruction failed to specify from what fact the jury was to draw no unfavorable inference. This renders the instruction inadequate." Id., 272–73.

_____

[6]The state's appellate counsel was asked multiple times during oral argument about the effect and significance of *Hicks* in the present case and whether the state was asking the court to overrule *Hicks*. Counsel suggested that *Hicks* was distinguishable, although she did not identify any meaningful distinction relevant to the disposition of this appeal. Counsel acknowledged that the trial court's omission of the no adverse inference instruction from the final jury instructions in this case was a "failure to follow what the Appellate Court said" in *Hicks* but also observed that *Hicks* "may have been wrong." Although this litigation position under most circumstances might cause us to decline to consider whether *Hicks* was correctly decided, we are persuaded that the issue

*Hicks* expressly rejected the contention, also made by the state in this case, that the statutory requirement was satisfied, notwithstanding the omission of the prescribed instruction from the final jury instructions, because the trial court gave the no adverse inference instruction as part of its preliminary instructions prior to the start of evidence. See id., 275–77. Relying on two earlier Appellate Court decisions construing § 54-84 (b), the court explained that the trial court's preliminary instruction failed to satisfy the statute's mandate. See id., citing *State* v. *Stewart,* 60 Conn. App. 301, 308–10, 759 A.2d 142, cert. granted and remanded for reconsideration, 255 Conn. 913, 763 A.2d 1039 (2000) (appeal withdrawn October 1, 2001), and *State* v. *Vega,* 36 Conn. App. 41, 46, 48, 646 A.2d 957 (1994). The Appellate Court approvingly recited a variety of reasons that had been identified in *Stewart* and *Vega* as grounds to reject the claim that a trial court could discharge its statutory duty under § 54-84 (b) by including the no adverse inference instruction only in its preliminary instructions. See *State* v. *Hicks*, supra, 97 Conn. App. 275–77. Those reasons included the passage of time between the preliminary instructions and the final instructions, the statutory mandate that the instruction be given "in the context of the *trial*," not during pretrial proceedings, and the fact that, prior to the trial's conclusion, "the court does not know whether the defendant will testify." (Emphasis in original; internal quotation marks omitted.) Id., 276.

The court in *Hicks* concluded that "the rationale set forth in *Vega* and *Stewart* defeats [the state's] argument [that the preliminary instruction satisfied the statutory requirement or rendered the noncompliance harmless]. [In *Hicks*], the [trial] court provided preliminary instructions to the jury [at the start of trial] several days prior to the time it delivered its [final] jury charge. At the time that it delivered its preliminary instructions, the court obviously was unable to state with certainty whether the defendant would exercise his right not to testify during

should be addressed and decided in this case because we are undertaking review for plain error.

the evidentiary phase of the trial. . . . The instruction set forth in **[§ 54-84] (b)** provides that the court shall instruct the jurors 'that they may draw no unfavorable inferences from the accused's *failure to testify.*' . . . This language reflects that the instruction is mandatory in cases in which the defendant does not take the witness stand and that the instruction should address this *actuality.* Stated otherwise, an instruction that addresses the *possibility* that a defendant may elect not to testify, such as the one that the court provided to the jury prior to the presentation of evidence, is not the instruction set forth in the statute." (Citation omitted; emphasis in original.) Id., 277. *Hicks* clearly and unequivocally holds that the statutory no adverse inference instruction must be included in the final jury instructions and that earlier instructions to the jurors are an inadequate substitute. That holding has not been overruled or undermined since *Hicks* was decided in 2006.[7]

To find patent error in the present case, it is perhaps enough to say that the trial court instructed the jury in a manner that contravened the express holding of an Appellate Court decision involving indistinguishable circumstances. See, e.g., *Mendillo* v. *Tinley, Renehan & Dost, LLP*, 329 Conn. 515, 528 n.10, 187 A.3d 1154

---

[7]This court has decided two cases since *Hicks* involving a trial court's failure to instruct a jury in accordance with § 54-84 (b). See *State* v. *Michael T.*, 338 Conn. 705, 259 A.3d 617 (2021); *State* v. *Ruocco*, supra, 322 Conn. 796. In *Michael T.*, this court held that the trial court may give a jury instruction that deviates from the specific wording of § 54-84 (b), as long as the instruction does not materially alter the substantive meaning of the statute, and that it is not plain error for the trial court to deny a request for deviating language and to give the instruction using the exact language prescribed by the legislature. See *State* v. *Michael T.*, supra, 737–40. In *Ruocco*, this court considered whether the harmless error doctrine applies to claims that the trial court failed to give the jury instruction required by § 54-84 (b). See *State* v. *Ruocco*, supra, 802. We assumed, without deciding, that harmless error analysis applies to such claims and determined that, if the doctrine applies, then the state has the burden of demonstrating harmlessness beyond a reasonable doubt, which it could not do based on the facts of that case. See id., 805–808. Nothing in *Michael T.* or *Ruocco* casts doubt on the continued vitality of *Hicks*.

(2018) ("[T]he concept of binding precedent prohibits a trial court from overturning a prior decision of an appellate court. This prohibition is necessary to accomplish the purpose of a hierarchical judicial system. A trial court is required to follow the prior decisions of an appellate court to the extent that they are applicable to facts and issues in the case before it, and the trial court may not overturn or disregard binding precedent." (Internal quotation marks omitted.)). To the extent that the state argues that our plain error review should be limited to the statutory text of § 54-84 (b) alone, without consideration of the construction of that text as set forth in *Hicks*, this argument misapprehends the nature and scope of plain error review. For present purposes, the statutory text is imbued with the interpretive gloss provided by authoritative case law, which includes *Hicks*. See *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 497–501, 923 A.2d 657 (2007) (for purposes of General Statutes § 1-2z, text of statute includes prior judicial construction of its statutory language); see also *Airey* v. *Feliciano*, 352 Conn. 639, 646, 338 A.3d 344 (2025).

*Hicks*' construction of § 54-84 (b) established the statute's requirement that the no adverse inference instruction be given in the final jury instructions, and it is evident that the trial court in the present case overlooked *Hicks* as controlling precedent. Nonetheless, we are aware that this court has not previously had occasion to consider whether the holding in *Hicks* is correct. In this unusual circumstance, we are persuaded that our review for plain error in this case should address that question. The issue has been briefed by the parties in substance, although without express reference to *Hicks* itself. See footnote 6 of this opinion and accompanying text. Having considered the matter fully, we conclude that *Hicks* correctly determined that the statutory mandate of § 54-84 (b) requires the trial court to give the no adverse inference instruction in its final instructions, immediately prior to the jury's deliberation. The reasoning in *Hicks*, summarized previously, is sound, and

we find compelling, additional support for that holding upon further examination.

Section 54-84 (b) provides in relevant part that, "[u]nless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. . . ." The statute does not state explicitly *when* the instruction must be given, but the intention of the legislature in this regard emerges with clarity upon consideration of what it meant to "instruct the jury" when the law was enacted. See, e.g., *Kuchta* v. *Arisian*, 329 Conn. 530, 537, 187 A.3d 408 (2018) (determining meaning of "advertising signs" based on definitions that were "contemporaneous with the time when the grant of authority to regulate 'advertising signs and billboards' was added to the . . . statute"); *State* v. *Wright*, 320 Conn. 781, 801–802, 135 A.3d 1 (2016) (determining meaning of word "material" as used in statute based on its meaning "[a]round the time" of statutory enactment); see also *Maturo* v. *State Employees Retirement Commission*, 326 Conn. 160, 176, 162 A.3d 706 (2017) ("[w]hen a term is not defined in a statute, we begin with the assumption that the legislature intended the word to carry its ordinary meaning, as evidenced in dictionaries in print at the time the statute was enacted").

Section 54-84 (b) was enacted in 1977. See Public Acts 1977, No. 77-360. The historical record indicates that preliminary instructions—in the sense of instructions given to the jury immediately before the presentation of evidence—were not used in Connecticut at that time and did not make an appearance until years later. Our research has not uncovered a single reported decision mentioning their use until *State* v. *Woolcock*, 201 Conn. 605, 518 A.2d 1377 (1986).[8] Indeed, preliminary instructions were apparently such a novelty

---

[8]Prior to *Woolcock*, the reported cases used the term "preliminary instructions" to refer to the general portion of the jury instructions given after closing arguments in every case, as opposed to case-specific instructions. See, e.g., *State* v. *Edwards*, 163 Conn. 527, 530, 316 A.2d 387 (1972).

in Connecticut in 1986—nine years after passage of § 54-84 (b)—that this court was called on in *Woolcock* to determine whether the trial court's use of "this innovative procedure" violated the defendant's due process rights.[9] (Footnote omitted.) Id., 621; see id., 618–21. *Woolcock* noted that the pertinent rule of practice at the time of the trial in 1983 provided in relevant part that " '[t]he judicial authority shall deliver the instructions to the jury after the closing arguments.' " Id., 621 n.8; see id., 611.[10] Also noteworthy is the fact that a treatise containing model jury instructions likewise contains no mention whatsoever of preliminary instructions in the editions published both before and four years after § 54-84 (b) was enacted. See generally 1 D. Wright & J. Daly, Connecticut Jury Instructions (3d Ed. 1981); 1 D. Wright, Connecticut Jury Instructions (2d Ed. 1970). This historical review provides compelling evidence that the legislature intended that the prescribed instruction would be included in the final instructions because that is what the law meant by the words "instruct the jury" at the time of the statutory enactment. See, e.g., *State* v. *Fernando A.*, 294 Conn. 1, 19, 981 A.2d 427 (2009) ("the legislature is presumed . . . to know the state of existing relevant law when it enacts a statute" (internal quotation marks omitted)).

Beyond this evidence derived from contemporary usage, there is yet an additional reason to believe that the legislature intended the no adverse inference instruction to be included in the final charge to the jury: the instruction conveys to the jury a precept of foundational importance to our criminal justice system. See, e.g., *State* v. *Sinclair*, 197 Conn. 574, 582–83, 500 A.2d 539 (1985) ("[Section 54-84 (b)] serves to effectuate the fundamental constitutional right of a defendant not to testify in his criminal trial. That right has its origin in the privilege

---

[9]*Woolcock* referred to preliminary instructions as "preinstructions . . . ." *State* v. *Woolcock*, supra, 201 Conn. 618 n.7.

[10]In 1977, when § 54-84 (b) was enacted, Practice Book (1963) § 2265 provided in relevant part that "[t]he judicial authority shall deliver the instructions to the jury after the closing arguments. . . ."

against self-incrimination under both the federal and the state constitutions. . . . A trial court's failure to limit juror speculation on the meaning of a defendant's silence exacts an impermissible toll on the full and free exercise of the privilege [against self-incrimination]. . . . That rationale is fully appropriate to the application of the mandate of § 54-84 (b) . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.)).

Our case law makes it clear that, even after the advent of preliminary instructions in the 1980s, any jury instruction of importance to the jury's deliberative process must be included in the final instructions. Our decision in *Woolcock* again proves instructive. At the same time that *Woolcock* approved the use of preliminary instructions, it also emphasized that preliminary instructions serve a different purpose than final instructions and should not be considered as a substitute for them. "'It is well and good for [t]rial [j]udges to give jurors the benefit of an introductory and explanatory address to help dissipate some of the mystery that may lurk in laypersons who are about to undertake the responsibilities of playing a significant and determinative, albeit transient, role in the adjudicative process. . . . The desirability of orientation, however, does not excuse the requirement for the eventual *predeliberation* [i.e., final] instructions [that] would ordinarily be included in a charge in a particular case. To believe that the first is a substitute for the second, or to act as if it does not matter when but only that a charge is given, is to misapprehend the function of the latter.'" (Emphasis in original.) *State* v. *Woolcock*, supra, 201 Conn. 624, quoting *People* v. *Newman,* 46 N.Y.2d 126, 129–30, 385 N.E.2d 598, 412 N.Y.S.2d 860 (1978);[11] see also *State* v. *Lewis*, 220 Conn. 602, 614, 600

[11]This point was emphasized at length in *Woolcock*. Before quoting *Newman*, we observed that instructions given to the jury during trial but prior to the close of evidence "do not supersede those given after evidence and arguments under our practice . . . [and that] [i]nstructions of importance delivered during the trial would necessarily be repeated in the court's charge. . . . Although the federal case law discussing the propriety of also instructing the jury at the outset of the trial is sparse, those decisions that have addressed the matter have found preinstruction

A.2d 1330 (1991) ("[w]hen preliminary instructions are given, they do not supersede those given after evidence and arguments under our practice" (internal quotation marks omitted)).

We are left with no doubt that *Hicks* was correctly decided. The legislative mandate contained in § 54-84 (b), requiring trial courts to "instruct the jury" that it may draw no adverse inference from the defendant's choice not to testify unless the defendant requests otherwise, must be included in the final jury instructions. At the time of enactment, a legislature familiar with the relevant legal regime could have intended no other meaning.[12] To be clear, our conclusion in no way implies that the statutory instruction must be given *only* in the final instructions. The dissent is correct that jurors may wonder during trial whether they will hear from the defendant, and this is a good reason for the court to include the no adverse instruction in its preliminary instructions, as the trial court did in this case. There remains no justification, however, for omitting the instruction from the final charge, which is given "at [a] critical time, after all the evidence and after the argu-

to be a commendable practice so long as the jury is again fully instructed at the close of the proceedings." (Citations omitted; internal quotation marks omitted.) *State* v. *Woolcock*, supra, 201 Conn. 623.

[12]The dissent concedes that this construction of the statute is reasonable but contends that it is not "patently" so, and therefore takes the position that the trial court in this case did not commit "a clear and obvious, patent and undebatable error . . . ." Part I of the dissenting opinion. This argument misses the mark. The issue presently before this court is not whether § 54-84 (b) plainly and unambiguously mandates that the required instruction be included in the final instructions. The issue, rather, is whether it was plain error to overlook the controlling authority of *Hicks*, which unambiguously held that the instruction must be included in the final instructions. Because we hold today that *Hicks* correctly construed the statute, the trial court's failure to include the no adverse inference instruction in its final instructions was patent error. We specifically reject the dissent's suggestion that, when reviewing a case involving statutory construction for plain error, "our hierarchical judicial system" licenses this court to ignore the fact that the trial court failed to comply with a clear and express holding of the Appellate Court that we subsequently deem correct. (Internal quotation marks omitted.) Part II of the dissenting opinion.

ments of counsel." (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 220 Conn. 614; accord *State* v. *Woolcock*, supra, 201 Conn. 627.

We can quickly dispense with the dissent's assertion that *Hicks* was wrongly decided because it erroneously applied the *Golding*[13] framework to a nonconstitutional claim. See part II of the dissenting opinion. The observation is beside the point, even if it were correct.[14] In *Hicks*, the Appellate Court determined, as a matter of *statutory construction*, that the jury instruction mandated by § 54-84 (b) must be included in the final instructions given to the jury after the close of evidence. See *State* v. *Hicks*, supra, 97 Conn. App. 275–77. The fact that the Appellate Court reached the unpreserved issue via *Golding* rather than plain error review is irrelevant to the correctness of its analysis of the statutory issue on the merits; the statutory analysis is the same either way, and the construction is either correct or erroneous. We hold today that *Hicks* properly construed the statute.

Finally, the state argues that it was not plain error to omit the instruction required by § 54-84 (b) from the final instructions because defense counsel implicitly waived his objection to the final jury instructions by failing to raise it at trial. We reject this claim because it is well established that plain error review is available for unpreserved claims of instructional error. See, e.g., *State* v. *McClain*, 324 Conn. 802, 815, 155 A.3d

[13]*State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).

[14]For the reason set forth in the text accompanying this footnote, we need not resolve the issue here, but it is important to understand that the dissent's view on this point is in tension with our long established case law. A uniform line of this court's decisions spanning four decades unequivocally establishes that the statutorily required instruction is one of constitutional dimension because it is intended "to effectuate the fundamental constitutional right of a defendant not to testify in his criminal trial." *State* v. *Sinclair*, supra, 197 Conn. 582; accord *State* v. *Ruocco*, supra, 322 Conn. 804; *State* v. *Yurch*, 229 Conn. 516, 521, 641 A.2d 1387, cert. denied, 513 U.S. 965, 115 S. Ct. 430, 130 L. Ed. 2d 343 (1994). The dissent may believe that this precedent was wrongly decided, but the state has not asked us to reconsider or overrule it in this appeal.

209 (2017) (implied waiver of instructional claim under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011), "does not foreclose claims of plain error"); see also footnote 4 of this opinion.

To summarize, the Appellate Court's definitive construction of § 54-84 (b) in *Hicks*, in terms fully applicable to the facts of this case, required the trial court to include the no adverse inference instruction in its final jury instructions. Because the trial court failed to do so, we conclude that the omission of the no adverse inference instruction from the final jury instructions was a patent and readily discernible error.

## B
### Manifest Injustice

The second stage of the plain error analysis asks whether the trial court's patent error resulted in manifest injustice. See *State* v. *Jamison*, supra, 320 Conn. 596–97. The defendant, relying largely on the Appellate Court's conclusion in *State* v. *Suplicki*, 33 Conn. App. 126, 130, 634 A.2d 1179 (1993), cert. denied, 229 Conn. 920, 642 A.2d 1216 (1994), argues that the trial court's failure to comply with § 54-84 (b) requires automatic reversal. Alternatively, the defendant contends that he is entitled to a new trial because the state has failed to demonstrate that the omission of the statutorily mandated instruction was harmless beyond a reasonable doubt. The state argues that automatic reversal is inapplicable and that any error was harmless. We agree with the defendant's alternative argument that reversal is required because the state failed to prove harmlessness beyond a reasonable doubt.

### 1
### The Patent Error Does Not Require Automatic Reversal

Before reaching our manifest injustice analysis, we address the defendant's claim that automatic reversal is required to remedy the trial court's failure to give the no

adverse inference instruction required by § 54-84 (b). The defendant's argument for a rule of automatic reversal is based primarily on *Suplicki*, in which the Appellate Court held that "the total omission of the 'no adverse inference' instruction is plain error that is not subject to a harmless error analysis." Id. *Suplicki* cited this court's decisions in *State* v. *Burke,* supra, 182 Conn. 330, and *State* v. *Carter,* 182 Conn. 580, 438 A.2d 778 (1980), in support of the proposition "that the complete omission of a 'no adverse inference' instruction was reversible error without consideration of a harmless error analysis." *State* v. *Suplicki,* supra, 33 Conn. App. 130.

*Suplicki* accurately characterized *Burke* and *Carter* in that this court in both decisions, after determining that the trial court had completely omitted the instruction prescribed by § 54-84 (b), ordered a new trial without conducting a harmless error analysis. See *State* v. *Carter*, supra, 182 Conn. 580–81; *State* v. *Burke*, supra, 182 Conn. 330–34. Notwithstanding those two earlier cases, however, subsequent decisions from this court have left undecided the issue of whether automatic reversal is the appropriate remedy for such statutory noncompliance. See *State* v. *Ruocco*, supra, 322 Conn. 805; *State* v. *Sinclair*, supra, 197 Conn. 584–86. Both *Sinclair* and *Ruocco* found it unnecessary to reach the issue because, in each case, the court determined that the error was harmful. See *State* v. *Ruocco*, supra, 805 ("[w]e . . . need not decide that question today because . . . the state cannot establish that the violation in the present case was harmless beyond a reasonable doubt"); *State* v. *Sinclair*, supra, 586 (similar).

As in *Sinclair* and *Ruocco*, it is not strictly necessary in the present case to decide whether to adopt, reject, or modify the rule of automatic reversal set forth in *Suplicki* because we conclude that reversal is required under a harmless error analysis. See part II B 2 of this opinion. We nonetheless exercise our discretion to address this issue, which has been fully briefed in this appeal, because it has

remained open since it was raised more than forty years ago in *Sinclair*, its resolution has twice been deferred by this court, and it has on multiple occasions come before the Appellate Court, which is bound to follow *Suplicki*, unless and until we hold otherwise. Moreover, the state specifically argues that *Suplicki*'s reasoning is "unsound" and that we should apply a harmless error analysis instead of *Suplicki*'s rule of automatic reversal.

We overrule *State* v. *Suplicki*, supra, 33 Conn. App. 126, to the extent that it requires automatic reversal of a judgment of conviction when the trial court's jury instructions fail to comply with § 54-84 (b). We conclude that *Suplicki*'s rule of automatic reversal is unnecessary to protect the interests safeguarded by § 54-84 (b) and that a violation of the statute is not the kind of error that evades review for harmlessness.

Automatic reversal generally is required only in cases presenting a structural error. An error is considered structural "when it affects the framework within which the trial proceeds . . . such that the error always results in fundamental unfairness," or "when the effects of the error are simply too hard to measure . . . ." (Internal quotation marks omitted.) *State* v. *Joseph A.*, 336 Conn. 247, 265, 245 A.3d 785 (2020). "[S]tructural errors tend to by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless. . . . Constitutional violations have been found to be structural . . . only in a very limited class of cases." (Internal quotation marks omitted.) Id., 264–65. "For instance, the failure to give a reasonable doubt instruction to jurors that comports with constitutional requirements renders the outcome of their deliberations entirely unreliable." *State* v. *Cushard*, 328 Conn. 558, 570–71, 181 A.3d 74 (2018). In the same vein, "denial of counsel for the entirety of the defendant's trial is considered structural error" because it "pervade[s] the entire proceeding . . . ." (Internal quotation marks omitted.) Id., 572; see also *United States* v. *Davila*,

569 U.S. 597, 611, 133 S. Ct. 2139, 186 L. Ed. 2d 139 (2013) (observing that narrow category of structural errors includes, for example, "denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt"). "In contrast, an error is usually subject to harmless error review when it does not pervade or undermine the fairness of the trial. . . . [T]he reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Cushard*, supra, 571.

The defendant points out that many of our leading plain error cases involving the omission of the instruction required by § 54-84 (b) emphasize the vital purpose that the instruction serves. See, e.*g.*, *State* v. *Ruocco*, supra, 322 Conn. 804; *State* v. *Sinclair,* supra, 197 Conn. 582–83. Indeed, the statutory mandate to give the no adverse inference instruction is more protective than the federal constitutional standard, which requires the instruction only when requested by the defendant. See *Carter* v. *Kentucky,* 450 U.S. 288, 305, 101 S. Ct. 1112, 67 L. Ed. 2d 241 (1981). The defendant also emphasizes that we have long recognized the no adverse inference instruction to be of constitutional dimension because it is a legislative mandate protecting a defendant's fundamental constitutional right not to testify. See, e.*g.*, *State* v. *Ruocco*, supra, 804; *State* v. *Yurch*, 229 Conn. 516, 521–22, 641 A.2d 1387, cert. denied, 513 U.S. 965, 115 S. Ct. 430, 130 L. Ed. 2d 343 (1994); *State* v. *Sinclair*, supra, 582, 584.

The fact that the instruction reflects a legislative imperative intended to safeguard a constitutional right, however, does not inescapably mean that the failure to give the instruction amounts to structural error. For example, "the omission of a single element of a crime from the jury charge is not a structural constitutional error

that is exempt from harmless error analysis." *Banks* v. *Commissioner of Correction,* 339 Conn. 1, 30, 259 A.3d 1082 (2021); see *Greer* v. *United States*, 593 U.S. 503, 513, 141 S. Ct. 2090, 210 L. Ed. 2d 121 (2021) ("discrete defects in the criminal process . . . such as the omission of a single element from jury instructions . . . are not structural because they do not '*necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence'" (emphasis in original)), quoting *Neder* v. *United States*, 527 U.S. 1, 9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). Indeed, we have previously held that the failure to give a no adverse inference instruction that was requested by the defendant, in violation of *Carter* v. *Kentucky*, supra, 450 U.S. 305, is subject to harmless error analysis and is not structural error. See *State* v. *Dudla*, 190 Conn. 1, 3–7, 458 A.2d 682 (1983).[15] Similarly, "all federal courts, and the vast majority of state courts . . . hold that a trial court's failure to give a no adverse inference instruction when requested by a defendant . . . is not structural error, but rather, is amenable to harmless error review." *State* v. *Ruocco*, supra, 322 Conn. 815–16 (*Espinosa, J.*, dissenting); see id., 816 (*Espinosa*, *J.*, dissenting) (citing cases). We conclude that the failure to give the jury instruction required by § 54-84 (b) is not an error that falls within the narrow category of circumstances subject to automatic reversal.

Our rejection of the automatic reversal rule in no way diminishes the critical nature of the right at stake or the great weight that we assign to the legislative mandate embodied in § 54-84 (b). As we will explain shortly, statutory noncompliance will require reversal unless the state can meet the heavy burden of demonstrating that the error was harmless beyond a reasonable doubt.

---

[15]Because we concluded in *Dudla* that the trial court's failure to give the requested no adverse inference instruction was error under *Carter* v. *Kentucky*, supra, 450 U.S. 305, we did not reach the defendant's alternative argument that the failure to give the instruction also violated § 54-84 (b). See *State* v. *Dudla*, supra, 190 Conn. 6 n.6.

## 2
### The Error Was Not Harmless Beyond a Reasonable Doubt

Having determined that the patent error in the present case is not subject to automatic reversal, we next address the standard by which to assess manifest injustice under the plain error doctrine in this context. Plain error claims have arisen frequently since the legislature enacted the current version of § 54-84 (b) in 1977.[16] On appeal, we have found patent error in many of these cases, and, virtually without exception, we have conducted the second stage of the plain error analysis under the rubric of harmless error rather than using the manifest injustice framework ordinarily applied to plain error review.[17] We explained this doctrinal idiosyncrasy in *Ruocco*: "[O]rdinarily, under the second prong of the plain error test, it is the appellant's burden to demonstrate 'that a failure to reverse the judgment would result in manifest injustice.' . . . We previously have determined, however, that, because the statutorily mandated no adverse inference instruction was intended to effectuate a fundamental constitutional right, unless the defendant or defense counsel requests that the charge not be given, when the trial court fails to give that instruction, the burden is on the state to demonstrate that the omission was harmless beyond a reasonable doubt. See, e.g., *State* v. *Yurch*, [supra, 229 Conn. 523] . . . ." (Citation omitted.)

---

[16]We have identified twenty-eight such cases. It would serve no useful purpose to include a complete list here, but a representative sample is provided in footnote 17 of this opinion.

[17]See *State* v. *Ruocco*, supra, 322 Conn. 804–805 n.3 (applying harmless error analysis); *State* v. *Yurch*, supra, 229 Conn. 523–24 (same); *State* v. *Townsend*, 206 Conn. 621, 625–26, 539 A.2d 114 (1988) (same), overruled on other grounds by *State* v. *Michael T.*, 338 Conn. 705, 259 A.3d 617 (2021); *State* v. *Sinclair*, supra, 197 Conn. 584–86 (same); *State* v. *Tatem*, 194 Conn. 594, 599–601, 483 A.2d 1087 (1984) (same); *State* v. *Carrione*, 188 Conn. 681, 685–86, 453 A.2d 1137 (1982) (same), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983). But see *State* v. *Carter*, supra, 182 Conn. 581–82 (reversing for plain error but without discussing harmless error); *State* v. *Burke*, supra, 182 Conn. 333–34 (same).

*State* v. *Ruocco*, supra, 322 Conn. 804–805 n.3;[18] see also footnote 17 of this opinion.

The harmless error standard applied by this court in *Ruocco* and its forebears requires the state to establish, beyond a reasonable doubt, that there is no reasonable possibility that the jury was misled as a result of the instructional error. See *State* v. *Ruocco*, supra, 322 Conn. 804; *State* v. *Sinclair*, supra, 197 Conn. 584; *State* v. *Tatem*, 194 Conn. 594, 599, 483 A.2d 1087 (1984); see also *State* v. *Cook*, 287 Conn. 237, 252, 947 A.2d 307 ("[t]he test for determining whether a constitutional error is harmless . . . is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (internal quotation marks omitted)), cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). Because we agree with *Hicks*' construction of § 54-84 (b), the fact that the trial court gave a preliminary no adverse inference instruction to the jury does not alter the harmless error standard required by our precedent. As a result, this is a total omission case.[19] No version of the no adverse inference instruction was given in the court's final charge.

[18]The dissenting opinion in *Ruocco* also acknowledged that a harmless error analysis is the appropriate manifest injustice inquiry in the second stage of plain error review of an unpreserved instructional claim under § 54-84 (b). See *State* v. *Ruocco*, supra, 322 Conn. 808–10 (*Espinosa, J.*, dissenting). The dissent did not take issue with the use of a harmless error analysis to assess manifest injustice, only with the result of that analysis. See id.

[19]The dissent argues that the harmless error standard employed in cases like *Ruocco* should be limited to instances of " 'total omission,' " which it argues does not include this case, and that a different standard should apply when the no adverse inference instruction is omitted from the final jury instructions but given in preliminary instructions. Part III of the dissenting opinion. This point, first of all, misapprehends what constitutes a total omission under our case law applying § 54-84 (b). A total omission occurs if the final jury instructions contain nothing resembling the no adverse inference instruction, as in the present case. A partial omission of the instruction, by contrast, occurs when the instruction is given in the final jury instructions but deviates from the statutory language. See, e.g., *State* v. *Townsend*, 206 Conn. 621, 624–25, 539 A.2d 114 (1988), overruled on other grounds by *State* v. *Michael T.*, 338 Conn. 705, 259 A.3d 617 (2021). Moreover, even in cases

Our case law applying the harmless error standard in connection with noncompliance with § 54-84 (b) focuses primarily on two considerations. The first of these requires us to examine the jury instructions themselves and ask whether, "from the viewpoint of the charge as a whole, there is no reasonable possibility that the jury was misled" regarding the prohibition on drawing an adverse inference from the defendant's choice not to testify. *State* v. *Sinclair*, supra, 197 Conn. 584; see, e.*g.*, *State* v. *Ruocco*, supra, 322 Conn. 805–808 (omission of required instruction was not harmless, despite trial court's instructing jury on presumption of innocence and telling venire panel during jury selection that it should not " 'hold [it] against [the defendant]'" if he did not testify); *State* v. *Yurch*, supra, 229 Conn. 524 (finding harmless error, even though "the trial court improperly instructed the jury that it could not draw unreasonable inferences from the fact that the defendant did not testify," because court immediately gave instruction "completely prohibiting the use of that fact"); *State* v. *Marra,* 195 Conn. 421, 443, 489 A.2d 350 (1985) (although final charge "was not in strict compliance with . . . § 54-84 (b) in that the word 'unfavorable' was not used, the substantive meaning of the statutory requirement was conveyed [by the balance of the charge]"); *State* v. *Tatem*, supra, 194 Conn. 600 (because "[w]e cannot assume that lay jurors know what lawyers and judges know," fact that jury was instructed regarding state's burden of proof and defendant's right to remain silent did not cure defects in § 54-84 (b) instruction (internal quotation marks omitted)).

The second consideration is whether the evidence of guilt is overwhelmingly strong, such that there is no

involving partial omissions, we have applied the same harmless error standard used in total omission cases. See id., 625–26; *State* v. *Cobb,* 199 Conn. 322, 324–25, 507 A.2d 457 (1986), overruled on other grounds by *State* v. *Michael T.*, 338 Conn. 705, 259 A.3d 617 (2021); *State* v. *Carrione*, 188 Conn. 681, 684–86, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983). The state, unlike the dissent, does not argue that a different legal standard applies or that the defendant shoulders the burden of meeting that standard.

reasonable possibility that the instructional error contributed to the jury's verdict. See, e.g., *State* v. *Ruocco*, supra, 322 Conn. 805–806 (evidence was "sufficient" but not "ironclad"); *State* v. *Sinclair*, supra, 197 Conn. 586 (evidence was "sufficient" but "not overwhelming"). As part of this inquiry, the court will examine whether the evidence of guilt would have called for an explanation from the defendant such that his silence might give rise to an unfavorable inference. See *State* v. *Ruocco*, supra, 806 ("given the discrepancies in [the victim's] testimony and the fact that there was only one eyewitness . . . we cannot discount the possibility that the jury might have doubted [the witnesses'] testimony but found the defendant guilty because of his failure to testify"); *State* v. *Sinclair*, supra, 586 ("[o]n this essential element of the crime of burglary in the second degree [requiring that the defendant intend to commit a crime in a dwelling], the jury might well have buttressed the state's circumstantial evidence with an unfavorable inference improperly drawn from the defendant's failure to explain his conduct"); *State* v. *Dudla*, supra, 190 Conn. 7 ("The jury might have doubted the uncorroborated testimony offered of the defendant's guilt, but [have found] him [guilty] because he did not take the stand to deny his guilt. Because the jury might have considered the failure of the defendant to testify in determining the likelihood that the officer's testimony was true, we cannot find the trial court's failure to give a 'no inference' charge to be harmless error."); *State* v. *Thurman*, 10 Conn. App. 302, 314–15, 523 A.2d 891 ("[a]lthough the defendant did not testify at trial, his account of the events . . . was presented through the testimony of . . . witnesses," and, "[b]ecause [the jury was] unable to observe the defendant on the witness stand, [it] might have buttressed the state's evidence with an unfavorable inference improperly drawn from the defendant's silence at trial"), cert. denied, 204 Conn. 805, 528 A.2d 1152 (1987).

Turning to the first consideration—the overall effect of the instructions that were provided to the jury in this case—the state argues that omission of the no adverse

inference instruction from the final instructions was harmless because of the cumulative effect of **(1)** the no adverse inference instructions given before the start of evidence and during jury selection, and **(2)** other components of the court's final jury instructions that provided related information. In support of this claim, the state points to the following particulars. During jury selection, which began two months before trial, the trial court told prospective jurors that, "[i]f . . . the defendant decides not to testify, you must draw no unfavorable inference from his decision not to testify." After the jury was selected and sworn in, but before the start of evidence, the trial court gave a preliminary instruction, which included telling the jury that it "must draw no unfavorable inference from [the defendant's] decision not to testify if he so chooses not to testify." This preliminary charge was given eight days before the court delivered its final jury instructions. The state also relies on guidance included in the court's final instructions, most prominently the instructions that "the defendant is presumed to be innocent, unless and until proven guilty beyond a reasonable doubt," and that the jury's verdict must be "based on the facts drawn only from the evidence introduced . . . in the courtroom . . . ."[20]

We reject the state's claim that, in the aggregate, the instructions to the jury rendered noncompliance with § 54-84 (b) harmless. With respect to the content of the final jury instructions, we have previously rejected the contention that noncompliance with § 54-84 (b) is made harmless by instructions regarding the presumption of innocence and the state's burden of proof. See *State* v. *Ruocco*, supra, 322 Conn. 807 ("[w]hen . . . the [final] jury charge contains no language that resembles the instruction mandated by § 54-84 (b), we cannot assume that the jurors had sufficient knowledge of the law to be able to glean from the balance of the instructions that they

[20]The state also references the trial court's final instruction that the jury "may draw reasonable inferences from the established facts in this case" but that the inferences "must not be from a guess [on] the evidence."

should draw no adverse inference from the defendant's failure to testify"); see also *State* v. *Tatem*, supra, 194 Conn. 600 ("[w]e cannot accept the state's claim . . . that 'a reasonable juror hearing [the erroneous no adverse inference] instruction within the context of the entire charge would naturally assume that the defendant's silence formed no part of the case'" (citation omitted)); *State* v. *Thurman*, supra, 10 Conn. App. 311–12 ("[T]he charge provided the jury with an explanation of the burden and standard of proof, the presumption of innocence, and the fact that the defendant had a constitutional right not to testify. It was not sufficient, under the provisions of § 54-84 (b), for the trial court to inform the jury of these principles." (Footnote omitted.)). The final instructions cited by the state do not address the particular risk that the no adverse inference instruction is designed to confront, namely, the harm flowing from "juror speculation on the meaning of a defendant's silence" and the danger that the jury might improperly give evidentiary weight to the defendant's silence. *State* v. *Sinclair*, supra, 197 Conn. 583. The statutory mandate that the court give a no adverse inference instruction is not discharged by instructions regarding the presumption of innocence, the state's burden of proof, or the generic prohibition against guesswork.

If anything, our concern in the present case is heightened rather than diminished by the content of the final instructions, particularly the final instruction informing the jury that a reasonable doubt is one that "has its foundation in the evidence or lack of evidence." In the absence of the required no adverse inference instruction, this instruction could have left the jury with the impression that it could consider the defendant's failure to testify in its deliberations.

We also are unpersuaded by the state's argument that the inclusion of a no adverse inference instruction in the preliminary instructions given prior to the start of evidence and in the instructions given to the venire panels during jury selection renders the omission of that

instruction from the final instructions harmless beyond a reasonable doubt.[21] On the present factual record, we conclude for the following three reasons that the earlier instructions do not render the patent error harmless beyond a reasonable doubt.

First, as we explained in part II A of this opinion, final jury instructions serve a crucial purpose distinct from that of preliminary jury instructions. This court has firmly established the principle that, although preliminary instructions are useful for orienting the jury, "[t]he desirability of orientation . . . does not excuse the requirement for the eventual *predeliberation* instructions [that] would ordinarily be included in a [final] charge in a particular case. To believe that the first is a substitute for the second, or to act as if it does not matter when but only that a charge is given, is to misapprehend the function of the latter." (Internal quotation marks omitted.) *State* v. *Woolcock*, supra, 201 Conn. 624; see also *State* v. *Lewis*, supra, 220 Conn. 614. Thus, a preliminary instruction does not ordinarily cure the trial court's failure to give the no adverse inference instruction in the final jury instructions because it is not given "at [a] critical time, after all the evidence and after the arguments of counsel." (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 614.[22]

Second, and relatedly, the passage of time between preliminary instructions and jury deliberations creates

---

[21]Numerous decisions of the Appellate Court have rejected similar claims. See, e.g., *State* v. *Hicks*, supra, 97 Conn. App. 274–76; *State* v. *Stewart*, supra, 60 Conn. App. 309–310; *State* v. *Vega*, supra, 36 Conn. App. 46, 48.

[22]The distinction between preliminary instructions and final instructions can be seen in how the trial court in this case introduced those instructions to the jury. The court described its preliminary instructions as its "preliminary remarks . . . ." By contrast, the court began its final instructions to the jury by stating: "Members of the jury, you've heard the evidence presented in this case. Now, it is my duty to instruct you as [to] the law that you are to apply in the case. It is exclusively the function of the court to state the rules of law [that] govern the case with instructions as to how you are to apply them. It is your obligation to accept the law as I state it. You must follow all of my instructions

a risk that the jury will not remember and follow the admonition contained in the instruction required by § 54-84 (b) when it is omitted from final jury instructions. See *State* v. *Vega*, supra, 36 Conn. App. 48–49. In *Vega*, the trial court gave a preliminary no adverse inference instruction; see id., **46;** but the final jury instructions failed to satisfy § 54-84 (b) because they permitted the jury to draw fair but unfavorable inferences from the defendant's failure to testify. See id., 44, 48. The Appellate Court held that the preliminary instruction was insufficient to prove the harmlessness of the incorrect final charge beyond a reasonable doubt because "at least one week [had] elapsed between such instructions and the court's final charge." Id., 48. The proper timing of a no adverse inference instruction must be aligned with its fundamental purpose, which is to minimize juror speculation during jury deliberations; it does not serve that purpose to provide the instruction many days before deliberations begin.

In the present case, the trial court gave its preliminary jury instructions eight days before the jury began its deliberations, even longer than the weeklong gap in *Vega*, and its instructions to venire panels up to two months before deliberations. The state nevertheless argues that these instructions rendered any error harmless because we should assume that the jury followed them. We disagree. In addition to the length of time between the earlier instructions and the jury's deliberations, the jury, during that time frame, heard five days of evidence and one day of closing arguments and final jury instructions. The jury also received a hard copy of the final instructions, which did not include the no adverse inference instruction, for reference during its deliberations. It did not receive a written copy of the preliminary

and not heed some and ignore others. They are equally important." In so instructing the jury, the court made no reference to its preliminary remarks given before the presentation of evidence. Instead, it repeated most of the instructions given in those remarks, presumably to ensure that the jury applied them to the facts presented, but altogether omitted the no adverse inference instruction.

instructions. Under these circumstances, we perceive a realistic risk that the jurors would not remember the preliminary no adverse inference instruction during their deliberations and might speculate about the defendant's decision not to testify.

Third, including the no adverse inference instruction in the preliminary instructions and then excluding it from the final instructions is just as likely to result in overall confusion as coherency. As part of its harmless error analysis in *Vega*, the Appellate Court observed that a discrepancy between the preliminary instructions and the deficient final instructions was harmful because, "[w]hen preliminary instructions are given, they do not supersede those given after evidence and arguments under our practice." (Internal quotation marks omitted.) Id. The court expressed concern that the jury may have been misled by the final instructions, which failed to properly convey the requisite information to the jury. See id., 48–49. Based on both the discrepancy between the preliminary and final instructions and the length of time that had elapsed between the instructions, the Appellate Court in *Vega* held that there was "a reasonable possibility that the jury was misled to understand the charge to allow it to draw a fair, although unfavorable, inference from the defendant's failure to testify." Id., 49.

The other critical component of our harmless error analysis examines the strength and nature of the state's evidence of guilt and asks whether there is a realistic possibility, in light of those particulars, that the jury reasonably might have considered the defendant's choice not to testify in reaching its verdict. The evidence adduced at trial and the disputed factual issues before the jury lead us to conclude that there was a reasonable possibility that "the danger of juror misunderstanding or confusion that prompted the [legislature] to adopt" the statute requiring a no adverse inference instruction came to pass. *State* v. *Diaz*, supra, 348 Conn. 765. Given the lack of physical evidence linking the defendant to the victim's murder in the present case, the state's theory of

guilt relied heavily on the defendant's prior statements, such as his descriptions of his movements on the day the victim disappeared, which were inconsistent with other evidence. In her closing argument, the prosecutor also drew the jury's attention to the defendant's failure to explain to the police what had happened to his jacket that morning and suggested that he had disposed of his jacket to change his appearance. And perhaps most critically, Cruz' testimony that the defendant had confessed to the murder was left looming and unrebutted. This all naturally would have invited the jury to speculate as to how the defendant would explain any such inconsistencies, seemingly inculpatory circumstantial evidence, and incriminating statements. See, e.g., *State* v. *Ruocco*, supra, 322 Conn. 805–806; *State* v. *Thurman*, supra, 10 Conn. App. 314–15.

The nature of the evidence and the state's theory of guilt thus would have led the jury to wonder why the defendant chose not to take the stand to explain his prior statements and could reasonably have led the jury to draw an adverse inference from his failure to testify. In other words, under these circumstances, we cannot say that the evidence of the defendant's guilt was "so ironclad that we can conclude, as a matter of law, that the instructional omission was harmless." *State* v. *Ruocco*, supra, 322 Conn. 806; see also *State* v. *Thurman*, supra, 10 Conn. App. 314–15.

For the foregoing reasons, we conclude that the trial court's complete omission of the no adverse inference instruction required by § 54-84 (b) from the final jury instructions was patent error that resulted in manifest injustice. There is nothing opaque or confusing, as the dissent suggests; see part IV of the dissenting opinion; about this holding or its doctrinal implications: a criminal conviction will be reversed for plain error if the trial court fails to include the statutorily required instruction in its final instructions to the jury, unless the state can show that there is no reasonable possibility that the jury's verdict was affected by the omission. Nor

is there anything unconventional about our reasoning. By enacting § 54-84 (b), the legislature took the highly unusual step of requiring courts to instruct the jury on a particular point of law. Our cases explain that the prescribed instruction serves to effectuate a fundamental constitutional principle, and they treat the mandate with corresponding solemnity, pointing out that "[a] trial court's failure to limit juror speculation on the meaning of a defendant's silence exacts an impermissible toll on the full and free exercise of the privilege [against self-incrimination]." (Internal quotation marks omitted.) *State* v. *Sinclair*, supra, 197 Conn. 583. As such, when a trial court omits the statutorily required instruction and that omission potentially affects the jury's verdict, it also undermines the "integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Jamison*, supra, 320 Conn. 596.

Our review of the record reveals a reasonable possibility that the jury believed that it could draw an adverse inference from the defendant's exercise of his constitutional right not to testify at trial. Because both prongs of the plain error test have been satisfied, a new trial is required before a properly instructed jury.

The judgment is reversed and the case is remanded for a new trial.

In this opinion McDONALD, ALEXANDER, DANNEHY and BRIGHT, Js., concurred.